UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JACOB DOE, by and through His Mother, JENNIFER Y., | * * * |
| Plaintiff, | * * |
| v. | * * Civil Action No. 15-30027-MGM |
| RICHMOND CONSOLIDATED SCHOOL DISTRICT and BUREAU OF SPECIAL EDUCATION APPEALS, | * * * * |
| Defendants. | * |

MEMORANDUM AND ORDER ON PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT

(Dkt. Nos. 49, 52, & 56)

May 31, 2016

MASTROIANNI, U.S.D.J.

Plaintiff, Jacob Doe ("Student"),[1] acting through his mother, has brought this suit pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, against co-defendants, Richmond Consolidated School District (the "School District") and the Massachusetts Bureau of Special Education Appeals ("BSEA"), challenging the January 6, 2015 decision by a hearing officer at the co-defendant BSEA. Specifically, Student asks the court to reverse the hearing officer's finding that the Individualized Education Plan ("IEP") offered by the School District for the 2014-2015 school year offered Student a free appropriate public education ("FAPE") in the least

---

[1] In record from the Massachusetts Bureau of Special Education Appeals and some filings, Student is also referred to as "Mark Doe."

restrictive environment ("LRE"), as required under the IDEA. Additionally, the Student asks the court to find that student was provided with FAPE at the Middlebridge School ("Middlebridge"), the residential school at which Student was unilaterally placed by his parents[2] for the 2014-2015 school year, and order the School District to provide both reimbursement and prospective payment of the expenses of Student's placement at Middlebridge. The parties' cross-motions for summary judgment are currently before the court.

## I. BACKGROUND

A. Educational History

Student began attending the Richmond Consolidated School, a Pre-K-8th grade school operated by the School District, at least as early as the first grade. (Dkt. No. 25, Administrative Record 97, 118.) At some point he began receiving supplemental services pursuant to a 504 Accommodation Plan. (*Id.* at 118.) During the summer of 2012, prior to his seventh grade year, he was diagnosed with Autism Spectrum Disorder ("ASD"). (*Id.*) Previously Student had been diagnosed with Obsessive Compulsive Disorder ("OCD") and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.*) When the 2012-2013 school year began, Student's special education team ("TEAM") met to review the new diagnosis and evaluation. (*Id.*) The TEAM found that Student was eligible for special educational services pursuant to the IDEA and created an IEP for him for the 2012-2013 school year. (*Id.*) Student's parents accepted the 2012-2013 IEP, which called for (1) various classroom accommodations, (2) direct occupational therapy services to address sensory deficits and (3) direct social skills services with the school adjustment counselor. (*Id.* at 118, 187-

---

[2] Consistent with the approach adopted by the hearing officer, the court uses the word "parents" to refer to Student's mother and step-father.

201.) Consistent with the IEP, Student was placed in a regular education classroom that had no more than twelve students. (*Id.* at 118.)

Student was involved in several behavioral incidents in late fall and early winter of 2012. (*Id.* at 118, 1609-10.) During the same period, Student's parents also became concerned that Student was being bullied at school, however no formal bullying reports were filed by Student's parents. (*Id.* at 119.) A risk assessment relative to Student was conducted in January 2013 and Student's TEAM subsequently met in April to review the risk assessment and consider changes to Student's IEP. (*Id.* at 118-19.) No changes were made to the IEP, however the Special Education Director, Jenevra Strock began reeducating school staff about ASD. (*Id.* at 119.) Additionally, the school adjustment counselor, Dominic Bondini, had discussions with Student's outside therapist about using common language. (*Id.*)

In May 2013, Student was hospitalized for ten days in a pediatric psychiatric unit due to increased anxiety and OCD symptoms. (*Id.*) Student had recently experienced an escalation of his separation anxiety with respect to his mother and was missing time from school. (*Id.*) The discharge instructions from the hospital recommended that he attend a "step down program" and receive increasing passes to home and school. (*Id.*) The records from the hospitalization do not identify issues related to attending school. (*Id.*) When Student was discharged, he was taken to the step down program, but did not attend, instead returning home. (*Id.*) The local mental health practitioner Student saw recommended that he not attend school or take the MCAS at that time. (*Id.* at 119, 513-14.) The School District subsequently provided home tutoring for the remainder of the school year. (*Id.* at 119.)

During the summer of 2013, Student attended a wilderness-based, residential, therapeutic program. (*Id.*) While attending that program he was evaluated and his diagnoses of ADHD, OCD,

and AHD were reaffirmed. (*Id.*) The evaluation included a recommendation that Student be placed in a structured, residential environment. (*Id.* at 120.)

On August 21, 2013, Student's parents notified the School District that they were unilaterally placing Student at a residential school—The Hillside School. (*Id.*) Despite this unilateral placement decision, the School District held its annual IEP meeting for Student, who was then thirteen, on September 5, 2013. (*Id.*) Student left his placement at The Hillside School in April 2014 and the School District resumed providing tutoring services to Student for the remainder of the 2013-2014 school year. (*Id.*) Student and his family do not seek any reimbursement from the School District for the costs associated with Student's attendance at The Hillside School.

The School District held another TEAM meeting on June 13, 2014, to discuss the three-year reevaluation of Student, as required under the IDEA. (*Id.*) Student's parents attended this meeting and agreed to three assessments: a transition assessment, an occupational therapy assessment, and a math evaluation. (*Id.*) At the parents' request, the TEAM began drafting the IEP while the assessments were pending. (*Id.*) On June 23, 2014, Student's parents notified the School District that they would be unilaterally placing Student at Middlebridge for the 2014-2015 school year. (*Id.* at 121.) The following day, the School District sent a proposed IEP to Student's parents. (*Id.* at 120.)

The IEP called for (1) direct occupational therapy services, (2) direct services with the school adjustment counselor, (3) pullout math instruction with a special education teacher, (4) group social skills, and (5) services to address anxiety with a behaviorist. (*Id.* at 120-21.) A variety of classroom and testing accommodations, as well as extended school year services were also proposed. (*Id.*) Though Student had attended seventh grade during the 2012-2013 school year, the proposed IEP provided for Student to attend eighth grade during the 2014-2015 school year. (*Id.* at 187, 287.)

The transition assessment provided by the School District was conducted on June 24, 2014 and the occupational therapy assessment was conducted on June 28, 2014. (*Id.* at 121.) The

transition assessment found the primary barriers to a successful transition to adulthood would be his existing anxiety, OCD, ASD, and math issues. (*Id.*) The occupational therapy assessment found fine motor and sensory deficits and recommended the use of a graphic organizer as well as involvement with chores, meal preparation, crafts, and sports. (*Id.*)

On June 30, 2014, Student's mother filed a Hearing Request with the BSEA. (*Id.* at 3, 121) The preliminary statement indicated the request was filed in order to (preemptively) seek retroactive reimbursement for Student's placement at Middlebridge beginning on July 7, 2014. (A.R. 3.) Later that summer, another TEAM meeting was held to discuss the results of the transition and occupational therapy evaluations. (*Id.* at 121.) An updated IEP was proposed, though it did not include any substantive changes. (*Id.*) Student's parents rejected the IEP services and placement on August 19, 2014. (*Id.*) A third TEAM meeting was held September 11, 2014, after the results of an August 7, 2014 math evaluation were available. (*Id.*) At this September TEAM meeting two recommendations made by Judith Imperatore ("Imperatore"), a transition counselor privately hired by Student's parents, were also considered, even though the School District had not yet received Imperatore's written report. (*Id.* 121-22.) An amended IEP was sent to Student's parents the same day. (*Id.* at 121.) It updated Student's disabilities to include a math disability, added a math goal, and made a few other minor changes. (*Id.* 121-22.) On September 25, 2014, Student's parents again rejected the IEP services and placement. (*Id.* at 122.) Student's parents received a comprehensive transition assessment and vocational evaluation from Imperatore on October 3 or 4, 2014 and a copy was provided to their counsel a couple days later. (*Id.* at 1088.) The School District was not provided a copy of the report until the week prior to the BSEA hearing and no additional TEAM meetings were held prior to the BSEA hearing. (*Id.* at 122.)

<u>The BSEA Hearing</u>

As previously stated, Student's parents filed their request for a hearing with the BSEA on June 30, 2014. (*Id.* at 121.) The hearing was initially scheduled for August 4, 2014. (*Id.* at 117.) On July 23, 3014, the School District requested a postponement and then Student's parents requested a further postponement on August 7, 2014. (*Id.*) The hearing finally took place on November 3, 4, 5, and 25, 2014. (*Id.*)

At the commencement of the hearing, counsel for the School District objected because the School District had not received Imperatore's report early enough to convene a TEAM meeting to consider whether the IEP should be revised based on information in the report. (*Id.* at 1026-27.) Counsel for the Student's parents noted that since the parents, not the School District, paid for the evaluation, their only obligation was to provide the report, along with other exhibits for the hearing, no less than five days prior to the hearing. It is undisputed the parents met that deadline. (*Id.* at 1029.)

The Hearing Officer considered the positions of both sides and agreed that since the parents had paid for the evaluation, they could decide whether to provide the evaluation to the School District. (*Id.* at 1033.) She then went on to say that though the report could remain as an exhibit, she would not consider it to the extent Student's parents were relying on it to argue the IEP was not appropriate. (*Id.* at 1033-34.) She noted that the "the IEP is a snapshot in time" and went on to say that by choosing to provide the report only on the eve of the hearing, Plaintiff had deprived the School District of the opportunity to make changes to the IEP based on the report. (*Id.* at 1034.) In her written decision, the Hearing Officer reiterated her ruling, stating that since the school did not have the opportunity to consider the report when crafting the IEP which had been challenged, she would not consider it when deciding whether the IEP was appropriate. (*Id.* at 127.)

6

## II.     SUBJECT MATTER JURISDICTION

Plaintiff filed this appeal of the January 6, 2015 BSEA ruling pursuant to 20 U.S.C. § 1415(i)(2)(B), which permits "any party aggrieved by the findings and decision" made by the BSEA to bring a civil action in United States District Court within ninety days of the date of the BSEA decision. Plaintiff filed this action on February 18, 2015, well within the ninety-day period. This court, therefore, has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## III.     The IDEA

"Congress designed the IDEA as part of an effort to help states provide educational services to disabled children." *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008). Under the IDEA school districts have "an obligation to provide an adequate and appropriate education," but are not compelled "to afford a disabled child an ideal or an optimal education." *Id.* A school district meets its obligation to provide each disabled student with a FAPE "as long as the program that it offers to a disabled student is 'reasonably calculated' to deliver 'educational benefits.'" *Id.* School districts must also ensure that they provide disabled student with FAPE in the LRE, which means that whenever possible, a school district should ensure that disabled students are educated together with nondisabled students *Id.* at 285.

Under the IDEA, the IEP is the vehicle school districts use to ensure students are provided with FAPE in the LRE. 20 U.S.C. §§ 1412(a)(3)-(4), 1414(a)-(b). An IEP meets the requirements of the IDEA if it is reasonably calculated to provide FAPE in the LRE. *See Lt. T.B. ex rel N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004). "The development of an IEP is meant to be a collaborative project" between a student's parents and educational professionals working on behalf of the school district. *Five Town Cmty. Sch. Dist.*, 513 F.3d at 285. When the collaborative process is unsuccessful, the IDEA empowers parents to challenge either the school district's efforts to create

the IEP or the IEP itself. This adversary process begins with a due process hearing before a hearing officer and can continue to include judicial review of the hearing officer's decision. *Id.* Generally, when a hearing officer or court assesses the adequacy of an IEP, they do not "judge[] exclusively in hindsight" because an IEP is considered to be "a snapshot, not a retrospective." *Roland M. v. Concord School Committee*, 910 F.2d 983, 992 (1st Cir. 1990). "[T]he IEP must take into account what was, and was not, objectively reasonable" when the IEP was prepared and it is inappropriate to judge whether the IEP was reasonably calculated to provide FAPE in the LRE using information that only became available after the IEP was promulgated. *Id.* Additionally, when parents initiate the adversary process prior to the creation of a final IEP, the court, and presumably the hearing officer in the first instance, is not restricted to considering the adequacy of "only the latest version of the IEP," but may also consider "the way in which the IEP process unfolded." *Five Town Cmty. Sch. Dist.*, 513 F.3d at 286.

When a school district is unable to provide FAPE to a student, the IDEA may require the school district to pay for the student to attend a private placement. *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 12 (1993). Parents who are dissatisfied with the IEP offered by a school district may unilaterally choose a private placement for their child and then pursue payment from the school district. *Id.* However, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985). In such a case, the parent has the burden of proving in the adversary proceeding that the IEP offered by the school district was not reasonably calculated to provide FAPE and that the parents' chosen placement was proper under the IDEA. *See Florence Cty.*, 510 U.S. at 15.

IV.   LEGAL STANDARD

"[A] motion for summary judgment in an IDEA case is simply a vehicle for deciding the relevant issues[;] . . . the non-moving party is not entitled to the usual inferences in its favor" and summary judgement is not precluded where there is a dispute as to issues of fact. *Sebastian M. v. King Philip Regional School Dist.*, 685 F.3d 79, 84-85 (1st Cir. 2012). Instead, the "court's principal function is one of involved oversight." *Roland M.*, 910 F.2d at 989-90. In addition to considering the administrative record, the IDEA provides that the court shall consider additional evidence at the request of a party and base its decision on the preponderance of the evidence. *Id.*; 20 U.S.C. § 1415(i)(2)(c). At the same time, the court is required to "give due deference to the findings of the [BSEA] hearing officer." *Sebastian M.*, 685 F.3d at 85. In order to balance these somewhat contradictory directives, the court must be mindful that its job is not to "impos[e] [its] view of preferable educational methods upon the States." *Roland M.*, 910 F.2d at 989-90.

In this case, the court must first determine whether the Hearing Officer's ruling—that the 2014-15 IEP proposed by the School District was reasonably calculated to provide FAPE to Student—was erroneous. Only if the court determines that decision was erroneous, does the court continue on to consider whether the Middlebridge placement provided Student with FAPE. And, only if the court were to answer that question affirmatively, would it consider whether to order the School District to provide reimbursement and prospective payments for the Middlebridge placement. *See Sebastian M.*, 685 F.3d at 86 (1st Cir. 2012).

IV.   DISCUSSION

Plaintiff makes three arguments for why this court should reverse the ruling of the BSEA hearing officer finding that the IEP offered by the School District was reasonably calculated to provide Student with FAPE. First, Plaintiff asserts the Hearing Officer erred, as a matter of law,

9

when she declined to consider the testimony of Plaintiff's experts or Imperatore's written report with respect to the question of whether the IEP provided FAPE. Plaintiff also argues the Hearing Officer erred by not considering relevant and important testimony from Student. Finally, Plaintiff asserts, generally, that the preponderance of the credible testimony supports a finding that the 2014-15 IEP proposed by the School District was not reasonably calculated to provide Student with FAPE.

The court first considers Plaintiff's argument that the Hearing Officer erred, as a matter of law, when she decided at the hearing, and reiterated in the written decision, not to consider Plaintiff's expert evidence. There are two parts to Plaintiff's argument. First, Plaintiff asserts the Hearing Officer's decision not to consider the expert evidence provided by Plaintiff was equivalent to erroneous exclusion because the Plaintiff followed applicable procedural rules for providing the report to the School District. Second, Plaintiff argues that even if the Hearing Officer's decision not to consider the expert evidence was procedurally sound, it erroneously elevated the procedural rights of the School District above the Student's right to receive FAPE, thus violating Massachusetts law.

A. <u>Plaintiff's Expert Evidence</u>

The court turns first to Plaintiff's argument that the Hearing Officer's decision was procedurally improper. Student's parents paid for Plaintiff's expert report and the final report was provided to the School District, along with other documents, five business days before the hearing. As implemented, the IDEA does not require that parents who independently pay for reports or evaluations provide copies to the school district. 71 Fed. Reg. 46690-91 (Aug. 14, 2006) ("Analysis of Changes"); *see also* 34 C.F.R. § 300.502. However, when a parent wishes to use an evaluation in a due process hearing, the IDEA does require the parent to provide the evaluation, and recommendations based on the evaluation, to the other parties no less than five business days prior to the hearing. 20 U.S.C. § 1415. This requirement ("the Five Day Rule") has also been incorporated

in the hearing rules promulgated by the BSEA. Rule IX:A, Hearing Rules for Special Education Appeals (Feb. 2008), *available at* http://www.mass. gov/anf/hearings-and-appeals/bureau-of-special-education-appeals-bsea/.

Plaintiff argues she complied with the Five Day Rule and the Hearing Officer's decision not to consider the report was procedurally improper. The court sees the situation differently. Compliance with the Five Day Rule does not guarantee that a particular piece of evidence is relevant to a particular issue. The Hearing Officer did not find the evidence was improperly offered, but rather that it was irrelevant to the question of whether the IEP was reasonably calculated to provide FAPE. The adequacy of the IEP must be examined based on what was known to the school district when the IEP was promulgated.[3] *Roland M.*, 910 F.2d at 992. Additionally, the Hearing Officer found Plaintiff's decision to wait until the eve of the hearing to provide the expert report to the School District did not merely inconvenience the School District, but circumvented the collaborative TEAM process established under the IDEA, giving the Hearing Officer a further reason to discount evidence offered by Student's parents. *See Five Town Cmty. Sch. Dist.*, 513 F.3d at 286.

Turning to the second part of Plaintiff's argument, the court considers whether the Hearing Officer's decision not to consider Plaintiff's expert evidence impermissibly elevated the procedural interests of the School District above Student's right to FAPE. Plaintiff has cited a Massachusetts statute and several BSEA rulings to support her position. None of them suggests a rule of the scope argued by Plaintiff.

The statutory citation, Mass. Gen. Laws. ch. 71B, § 3, directs that when a parent refuses an educational program offered to their child, the hearing officer "shall order such educational

---

[3] Had the Hearing Officer reached other issues, such as whether an inappropriate IEP could be modified or whether Middlebridge is an appropriate placement, it is possible, if not likely, that the Hearing Officer would have considered Plaintiff's expert evidence.

placement and services as he deems appropriate." This broad language is not followed with specific details about what evidence a hearing officer must consider or how different types of information must be handled. Nor does the statute distinguish between disputes in which the student is in the placement set out in a disputed IEP and those where the student has been unilaterally moved to an alternative placement. On its own, this language does not obligate a hearing officer to consider evidence that was not available to a school district when determining whether the IEP provides FAPE. Where, as here, the hearing officer finds the school district participated in the TEAM process in good faith, the withholding of the evidence prevented the school district from considering it within the TEAM process.

Parents who unilaterally remove students from a school district placement face a heavy burden when they seek retroactive reimbursement. *Florence Cty. Sch. Dist. Four*, 510 U.S. at 15. They are required to show the IEP was not reasonably calculated to provide FAPE and the placement they selected was proper. *Id.* For parents who prematurely abandon the IEP collaborative process, this is an especially difficult burden because parents who obstruct or interrupt the process for developing an IEP should not be permitted to benefit from their "refusal to cooperate fully in the collaborative process." *Id.*

The requirement Plaintiff proposes the court read into Massachusetts law would alter this balance. Instead of encouraging parents to fully participate in the collaborative IEP process, it could give parents an incentive to unilaterally remove students from school district placements, independently obtain evaluations, and then provide them to the school district only at the last minute when the school district has no opportunity to make changes to the IEP. No reasonable reading of the statutory language justifies such a shift.

The BSEA decisions cited by Plaintiff are also consistent with the Hearing Officer's decision to consider "the way in which the IEP process unfolded" when deciding what weight, if any, to give

to Plaintiff's expert's evidence. *Five Town Cmty. Sch. Dist.*, 513 F.3d at 286. The hearing officer in one case denied a continuance sought by a school district that first received an expert report from the parents pursuant to the Five Day Rule after finding that the school district could have obtained the report much earlier, had it been inclined to do so. *In Re: Quannell J.*, BSEA 08-5135, decided October 29, 2008 (Dkt. No. 50-1). As in this case, the hearing officer considered the course of the collaborative process and denied the continuance to avoid rewarding the school district for delays of its own creation. In another case, the hearing officer decided it could rely on new information when considering whether a school district had any obligation to provide retroactive reimbursement because the school district had received the information with sufficient time to convene a TEAM meeting, but had elected not to do so. *Groton-Dunstable Regional School District*, BSEA 06-0890, 12 MSER 350 (2006). The decision of the hearing officer in a third BSEA case cited by Plaintiff was similarly responsive to the way the collaborative process unfolded. As the dispute developed, the hearing officer observed the parties shift from focusing on the information available when the IEP was drafted to considering what services the student would need for the remainder of the year and the following year. In light of that change, the hearing officer elected to consider evidence that was not available to the school district when the IEP was drafted. *In Re: Amelia v. Boston Public Schools*, BSEA 06-3610, 16 MSER 71 (2010).

In this case, the Hearing Officer arrived at the decision to limit consideration of Plaintiff's expert evidence after she considered the source of the delay in the production of the evidence and the way the School District had responded in the past when new information became available. The Hearing Officer credited the School District with a genuine desire to create an appropriate IEP for Student, noting its past willingness to convene TEAM meetings when new information about Student became available. Reviewing the Hearing Officer's decision de novo, this court finds the decision was consistent with the policies embodied in the IDEA and Massachusetts law.

B. Student's Testimony

Plaintiff's second argument is that the Hearing Officer erred by not giving sufficient consideration to Student's testimony. The Hearing Officer did not discuss the specific testimony offered by most of the witnesses who testified at the hearing, including Student. Although deciding issues of credibility is a core responsibility entrusted to hearing officers, there is no requirement that hearing officers document those decisions in a particular way; the court makes an independent review of the record to determine whether the hearing officer's decision was supported by a preponderance of the evidence. *Roland M.*, 910 F.2d at 989. The Hearing Officer characterized the testimony offered by the School District staff as credible, thereby implying the evidence offered by Plaintiff, including Student's testimony, was not credible to the extent it contradicted the evidence offered by the School District staff. After reviewing the record, the court finds no basis for reaching a different conclusion. Other evidence was far more relevant to answering the key questions in this case—whether Student made effective progress while placed in the School District and whether Student had educational needs that could only be accommodated in a residential setting.

C. Preponderance of the Evidence

The court now arrives at Plaintiff's final argument, that the preponderance of the credible testimony does not support the Hearing Officer's decision. Having reviewed the record, and mindful of the Plaintiff's burden, the court finds the Hearing Officer's conclusion that the IEP was reasonably calculated to provide FAPE is supported by a preponderance of the evidence. The IEP included services to address each of Student's identified educational deficits. Student's academic reports and test scores demonstrate he made progress during the 2012-2013 school year, and the prior school years. The records from Student's hospitalization in the spring of 2013 do not suggest a link between the hospitalization and his experience at school.

Ample evidence demonstrates that the School District was fully engaged in the IEP process, seeking evaluations and convening TEAM meetings to consider all new information, and genuinely committed to meeting Student's needs. On the other hand, Plaintiff elected not to provide the transition evaluation report to the School District until shortly before the hearing and did not identify specific deficits that would require a residential placement. While there was certainly evidence that Middlebridge is the placement preferred by Student and Plaintiff, that preference, by itself, is irrelevant to determining whether the School District was able to provide Student with FAPE. The IDEA does not guarantee a student who has been provided with FAPE the right to a different placement, even though some involved may believe it to be the ideal setting. *Five Town Cmty. Sch. Dist.*, 513 F.3d at 284.

## V. Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment are hereby ALLOWED and Plaintiff's Motion for Summary Judgment is hereby DENIED. This case may now be closed.

It is So Ordered.

      /s/ Mark G. Mastroianni
    MARK G. MASTROIANNI
    United States District Judge